UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:19-CV-00073-GNS-HBB

BRETTON WESTMORELAND                                                              PLAINTIFF

v.

BUTLER COUNTY, KENTUCKY, et al.                                  DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendants' Motion for Summary Judgment (DN 26). The motion is ripe for adjudication. For the reasons discussed below, the motion is **GRANTED**.

**I.**      **STATEMENT OF FACTS**

On May 27, 2018, Defendant Butler County Jail ("BCJ") booked Plaintiff Bretton Westmoreland ("Westmoreland") for an active bench warrant. (Defs.' Mot. Summ. J. Ex. 1, DN 26-3). Upon entry, Westmoreland requested he be separated from another inmate, Jerry St. Clair ("St. Clair"), because St. Clair believed Westmoreland had "ratted" on him during a prior incarceration. (Westmoreland Dep. 53:14-22, Jan. 23, 2020, DN 25-1). BCJ documented the request and separated the two inmates, and Westmoreland was then placed in an eight-man dormitory cell. (Defs.' Mot. Summ. J. Ex. 1; Westmoreland Dep. 58:20-25).

On the morning of June 4, St. Clair was moping the floor around Westmoreland's cell and told Westmoreland's cellmates that he was a "rat." (Westmoreland Dep. 60:18-62:3). St. Clair's statement riled up the dorm and, in particular, an inmate named Ricky Mullikan ("Mullikan"). (Westmoreland Dep. 62:14-21). Later in the morning, Westmoreland called his mother, Tanya Sublett ("Sublett"), relating to her what St. Clair had done and "that something's going to happen." (Westmoreland Dep. 67:5-7). Sublett called BCJ and spoke with Tara McMillin ("McMillin"),

the jail's Class D Coordinator. (McMillin Dep. 6-10, March 5, 2020, DN 25-4). Sublett expressed concern to McMillin about Westmoreland's wellbeing because St. Clair was on the floor causing problems and had told the inmates in Westmoreland's cell that he was a "rat." (Defs.' Mot. Summ. J. Ex. 2, DN 26-4).

Before being notified about the call, Defendant Jailer Rocky Tyree ("Tyree") claims to have asked Westmoreland whether he wanted to be moved, and he declined, although Westmoreland denies this conversation occurred. (Tyree Dep. 11:19-12:4, Mar. 5, 2020, DN 25-2; Westmoreland Dep. 68:17-18). About fifteen minutes after the alleged conversation, Tyree met with McMillin who gave him the message from Sublett. (Tyree Dep. 12:4). Tyree testified he explained to McMillin that he had just spoken with Westmoreland, who did not want to be moved, and so he did not feel there was any need to follow up on the phone call. (Tyree Dep. 16:18-17:10; Fugate Dep. 88:18-23, Mar. 5, 2020, DN 25-3). At 3:00 p.m. or 4:00 p.m., Westmoreland again called his mother, who indicated she had spoken with the jail and that Tyree would take of everything. (Westmoreland Dep. 72:20-73:18). Later in the evening, Westmoreland asked Deputy Jesse Kidd ("Kidd") if he could be moved because he felt the inmates were going to do something to him. (Westmoreland Dep. 67:12-25). Kidd denied the request but indicated Westmoreland asked to be moved because his cellmates were "getting on his nerves." (Defs.' Mot. Summ. J. Ex. 3, DN 26-5).

According to Westmoreland, tensions in the cell began to escalate around dinner time. (Westmoreland Dep. 71:13-14). From 6:00 p.m. to midnight, BCJ deputies patrolled the cell seven times, but after midnight the other cellmates began riling up Mullikan. (Defs.' Mot. Summ. Ex. 4, DN 26-6). Mullikan eventually attacked Westmoreland and broke his jaw. (Westmoreland Dep. 74:14-16; 78:1-79:24; 81:1-82:6).

Westmoreland filed this action against Tyree, McMillin, Kelli Fugate, and BCJ asserting claims for failure to protect him in violation of his Eighth and Fourteenth Amendment rights pursuant to Section 1983; negligence and gross negligence under Kentucky law[1]; and violation of KRS 441.045(3) for allegedly releasing him to avoid paying his medical bills. (Compl. DN 1; Am. Compl. ¶¶ 17-21, DN 4). Following discovery, Defendants moved for summary judgment. (Defs.' Mem. Supp. Mot. Summ. J, DN 26-2 [hereinafter Defs.' Mot. Summ. J.]). Westmoreland then voluntarily dismissed his claims against McMillin and Fugate. (Agreed Order, DN 28).

## II. JURISDICTION

Subject matter jurisdiction is afforded over this matter through federal question and supplemental jurisdiction. *See* 28 U.S.C. §§ 1331, 1367(a).

## III. STANDARD OF REVIEW

In ruling on a motion for summary judgment, the Court must determine whether there is any genuine issue of material fact that would preclude entry of judgment for the moving party as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the initial burden of stating the basis for the motion and identifying evidence in the record that demonstrates an absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the moving party satisfies its burden, the non-moving party must then produce specific evidence proving the existence of a genuine dispute of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

While the Court must view evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show the existence of some "metaphysical doubt

---

[1] Westmoreland acknowledges that BCJ enjoys sovereign immunity from his state claims. (Pl.'s Resp. Defs.' Mot. Summ. J. 15 n.9, DN 29).

as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted). Rather, the non-moving party must demonstrate that a genuine factual dispute exists by "citing to particular parts of the materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient" to overcome summary judgment. *Anderson*, 477 U.S. at 252.

## IV. DISCUSSION

### A. Federal Law

The remaining Defendants, Tyree and BCJ, move for summary judgment on the merits of Westmoreland's failure-to-protect claim and assert the defense of qualified immunity on behalf of Tyree. (*See* Defs.' Mot. Summ. J. 8, 13).

#### 1. *Qualified Immunity*

Although Section 1983 provides "a vehicle for a plaintiff to obtain damages for violations of the Constitution or a federal statute[,] . . . the law provides government officials with qualified immunity from § 1983 claims." *Casey v. Rouse*, No. 7:17-145-KKC-EBA, 2020 WL 1236306, at *2 (E.D. Ky. Mar. 13, 2020) (internal citation omitted). "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted). "Generally, summary judgment based on qualified immunity is proper if the officer was not on notice that his conduct was clearly unlawful." *Bletz v. Gribble*, 641 F.3d 743, 749 (6th Cir. 2011) (citation omitted).

"Defendants bear the initial burden of coming forward with facts to suggest that they were acting within the scope of their discretionary authority during the incident in question." *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1095 (6th Cir. 1992) (citation omitted). "Once raised, the plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity." *Bletz*, 641 F.3d at 750 (citation omitted).

Qualified immunity involves a two-part inquiry: "First, taken in the light most favorable to the party asserting the injury, do the facts alleged show that the officer's conduct violated a constitutional right? Second, is the right clearly established?" *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)); *see also Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that courts may address the two questions in either order). Where the parties acknowledge that a defendant's acts were discretionary, "the only question is whether [the defendant] violated one or more of [the plaintiff's] clearly established statutory or constitutional rights of which a reasonable person would have known." *Logsdon v. White*, No. 1:13-CV-00073-GNS, 2015 WL 3849907, at *3 (W.D. Ky. June 22, 2015). The Court's analysis will begin with the first question.

"[U]nder the Fourteenth Amendment, pretrial detainees are 'entitled to the same Eighth Amendment rights as other inmates.'" *Richko v. Wayne Cty.*, 819 F.3d 907, 915 (6th Cir. 2016) (citation omitted). The Eighth Amendment requires prison officials take reasonable measures to protect prisoners from violence at the hands of other prisoners. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (citation omitted). To establish a claim for failure to protect, a plaintiff must show

5

prison officials acted with deliberate indifference to a substantial risk of serious harm.[2] *Curry v. Scott*, 249 F.3d 493, 506 (6th Cir. 2001).

### a. Objective Component

Under the objective prong of the failure-to-protect claim, "a prison inmate first must show that the failure to protect from risk of harm is objectively 'sufficiently serious.' The inmate must show that 'he is incarcerated under conditions posing a substantial risk of serious harm.'" *Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011) (internal citation omitted) (citing *Farmer*, 511 U.S. at 833). The question here is whether there was an objectively substantial risk of harm to Westmoreland before the assault occurred. Defendants contend an inmate calling another inmate a "rat" does not raise red flags because it is quite normal in the jail setting. (Defs.' Reply Mot. Summ. J. 6, DN 30 [hereinafter Defs.' Reply]). Defendants argue the only cases dealing with this issue involve an inmate's designation as an informant by a jail official, not another inmate. (Defs.' Reply 6).

It is true that "[p]rison officials who identify an inmate as a 'snitch' to other inmates, with intent to provoke an assault or the fear of assault, demonstrate deliberate indifference to the inmate's safety and may be liable under the Eighth Amendment." *Odom v. McKenzie*, No. 12-CV-79-HRW, 2012 WL 6214367, at *3 (E.D. Ky. Dec. 13, 2012) (citations omitted). It is also true, however, that "[i]t does not matter whether the risk is caused by the actions of prison officials or

---

[2] Westmoreland argues alternatively that the Supreme Court in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), changed the standard from deliberate indifference to "objective unreasonableness" for pretrial detainees. (Pl.'s Resp. Defs.' Mot. Summ. J. 11). The Sixth Circuit has yet to alter the standard for failure to protect claims and has continued to apply the deliberate indifference standard. *See Mangum v. Repp*, 674 F. App'x 531, 537 (6th Cir. 2017). The Sixth Circuit noted a circuit split on the issue in a case of deliberate indifference to medical needs, but declined to adopt any view on the impact of *Kingsley*. *See Richmond v. Huq*, 885 F.3d 928, 937-38 n.3 (6th Cir. 2018).

may come at the hands of other inmates. If an inmate is believed to be a 'snitch' by other inmates, he or she faces a substantial risk of assault by other inmates." *Spotts v. Hock*, No. CIV. 10-353-GFVT, 2011 WL 676942, at *2-3 (E.D. Ky. Feb. 16, 2011) (internal citation omitted) (citation omitted). Although addressed less frequently, courts in the Sixth Circuit have accepted that being labeled a "snitch" or "rat" by another inmate presents an objectively serious risk of harm. *See Kennedy v. Wilson*, No. 10-CV-299-HRW, 2013 WL 5234435, at *8-9 (E.D. Ky. Sept. 17, 2013); *Bales v. Turner*, No. 3:15CV1677, 2016 WL 1241947, at *2 (N.D. Ohio Mar. 29, 2016); *Warren v. Sheldon*, No. 3:14CV306, 2017 WL 1023859, at *4 (N.D. Ohio Mar. 16, 2017); *Richard v. Bouchard*, No. 12-12516, 2013 WL 5913390, at *6 (E.D. Mich. Oct. 31, 2013).[3]

Furthermore, "the Sixth Circuit has held that to state a claim for deliberate indifference under the Eighth Amendment in such a context, a plaintiff must allege, and ultimately establish, that he or she suffered physical harm as a result of being labeled a snitch." *Branham v. Bolton*, No. 3:16-CV-P108-DJH, 2017 WL 2312479, at *4-5 (W.D. Ky. May 26, 2017) (citation omitted). Westmoreland has, accordingly, established the objective component by showing that St. Clair identified him as a "rat" in front of his cellmates and that he subsequently suffered physical harm during an attack.

### b. Subjective Component

Under the subjective component of the failure-to-protect claim, a prisoner must show the defendant knew the prisoner faced "a substantial risk of serious harm and disregard[ed] that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. "[A] plaintiff must produce evidence showing 'that the official being sued subjectively perceived facts from which to

---

[3] The touchstone case cited by these courts, though itself arising in a different Eighth Amendment context, was in fact based on an inmate being labeled a snitch by another inmate. *See Comstock v. McCrary*, 273 F.3d 693, 712 (6th Cir. 2001).

infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk.'" *Perez v. Oakland Cty.*, 466 F.3d 416, 424 (6th Cir. 2006) (citation omitted). A prisoner can meet this burden by demonstrating that: (1) a prison official was aware of a substantial risk to a particular inmate, even if the official was unaware of who would commit the assault; or (2) a prison official was aware that a particular inmate posed a substantial risk to a large class of inmates, even if the official was unaware of the exact prisoner at risk. *See Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004). Subjective knowledge may be "demonstrat[ed] in the usual ways, including inference from circumstantial evidence . . . [or] the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842. By contrast, to escape liability prison officials "might show . . . that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of the danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Id.* at 844.

Defendants argue that because Westmoreland previously told Tyree he did not need to be moved, Tyree was not subjectively aware of any risk to Westmoreland's safety at the time of receiving Sublett's note. (Defs.' Mot. Summ. J. 11). Westmoreland, however, denies ever speaking with Tyree.[4] In fact, Tyree cannot recall who or what caused him to speak to Westmoreland, and he did not document the conversation even after Westmoreland was injured. (Tyree Dep. 12:24-14:1). McMillin's incident reports similarly make no mention of Tyree's conversation with Westmoreland. (Defs.' Mot. Summ. J. Ex. 1). Westmoreland contends that

---

[4] Despite this, Westmoreland goes to great lengths, marshalling expert testimony opining that Tyree's alleged conversation was unreasonable because it was in the presence of other cellmates which would make it impossible for Westmoreland to truthfully respond to whether he needed to be moved. As Westmoreland ultimately denies the conversation ever occurred, these alternative arguments need not be addressed.

there is nothing to indicate Tyree's alleged conversation with him occurred after St. Clair made the accusation, and not beforehand, which renders the conversation irrelevant. (Pl.'s Resp. Defs.' Mot. Summ. J. 13). Accordingly, the question is whether Tyree was deliberately indifferent assuming he received the message from Sublett about the danger facing Westmoreland because St. Clair told his cellmate he was a rat.[5]

Westmoreland argues Tyree's subjective awareness of the risk is demonstrated by the fact that Tyree was informed of Sublett's message. (Defs.' Mot. Summ. J. 12). Defendants contend, as opposed to circumstances where a jail official exposes a government informant, an inmate calling another inmate a rat does not, by itself, raise a red flag because it is commonplace in a jail setting. (Defs.' Reply 6). Jails cannot take every allegation made by another inmate as true, lest officials become tasked with verifying every rumor throughout the facility. (Defs.' Reply 6).

---

[5] After St. Clair accused Westmoreland of being a "rat", Westmoreland states he did not initially know whether anything was going to happen, but he later called his mother when he felt differently. (Westmoreland Dep. 65:21-25). On the call, he told Sublett that he felt like he was in danger, that "something's going to happen." (Westmoreland Dep. 67:5-7). Around 11:00 a.m., after the call, Sublett contacted McMillin, who recorded the message in her incident report:

> On 6/4/2018 at approximately 10:53 am, I received a phone-call from Tanya Sublett. The call was regarding her son, Bretton Westmoreland. She was concerned about his well-being in the cell. I asked her why, she stated Inmate Jerry St. Clair had told all the inmates in the cell that Bretton was a "rat." She said Inmate Jerry St. Clair was now on floor and was causing problems. (He is on floor) I spoke with Jailer Rocky Tyree and explained the issue. I gave him a sticky note with her phone number and asked him to call her.

(Defs.' Mot. Summ. J. Ex. 2). McMillin states she conveyed this information to Tyree and asked him to follow up on the matter. (Tyree Dep. 12:4). Tyree claims he did not respond because he had just spoken with Westmoreland, who declined a request to be transferred. Later in the afternoon, Westmoreland followed up with Sublett who informed him that Tyree would "take care of everything", which allayed his concerns. (Westmoreland Dep. 73:11-15). Westmoreland claims that in the evening he asked Deputy Kidd to transfer him to another cell because he feared his cellmates. Westmoreland, however, does not show Tyree knew of this statement, and the only report of it states he requested a transfer because his cellmates were getting on his nerves.

9

The court addressed this same issue in *Kennedy v. Wilson*. The prison in that case removed the plaintiff from the general population and placed him in segregation because he had been identified in a "snitch list" circulating among the inmates. *Kennedy*, 2013 WL 5234435, at *1. The plaintiff was eventually attacked by another inmate housed in his segregated unit. *Id.* at *2. The Court rejected as "sheer speculation" the argument that officials should generally conclude any inmates not identified on the list posed a threat to inmates identified on the list. *Id.* at *9. The Court assumed the attacker believed the inmate was a snitch, but still held the plaintiff failed to submit evidence to suggest that prior to or on the day of the attack, the officials possessed knowledge indicating the attacker held animus against the inmate. *Id.* For support, *Kennedy* cited *Dale v. Poston,* 548 F.3d 563, 568 (7th Cir. 2008), where the court held:

> *[j]ust because a correctional officer knows an inmate has been branded a snitch- and it's common knowledge that snitches face unique risks in prison does not mean that an officer violates the Constitution if the inmate gets attacked*. Each case must be examined individually, with particular focus on what the officer knew and how he responded.

*Id.* at *8-9 (emphasis added) (citing *Dale*, 548 F.3d at 568). The court in *Kennedy* ultimately held "[m]erely because [the attacker] may have considered [the plaintiff] to be a snitch does not establish Eighth Amendment *Bivens* liability . . . ." *Id.* at *9.

Like the inmate in *Kennedy*, Westmoreland was segregated from St Clair for his own safety due to being considered a snitch. Similarly, Westmoreland ultimately argues Tyree should have known Mullikan believed he was a snitch and was likely to attack Westmoreland. Sublett's message conveyed that St. Clair had publicly labeled Westmoreland a rat to a discrete group of cellmates. But Sublett's message failed to identify any particular threat by any inmate.

Contrast Tyree's situation with the prison official in *Kennedy* who had a prior conversation with the attacker specifically stating that he would attack the plaintiff if they were housed together.

10

*Id.* at *10-11. The court in *Kennedy* held, in that instance, the official had sufficient knowledge to infer a substantial risk of harm. *Id.* at *12. Ultimately, while it is true Tyree cannot avoid liability "by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the *specific prisoner*[,]" Sublett's message does not support an inference that Tyree "was aware of an obvious, substantial risk to inmate safety . . . ." *Farmer*, 511 U.S. at 843 (emphasis added). To the contrary, Westmoreland's case at best is that Tyree knew Westmoreland's mother was concerned generally about her son's wellbeing because St. Clair told Westmoreland's cellmates he was a rat. Accordingly, even if Tyree failed to follow up on the message from Sublett, he still did not possess sufficient knowledge based on the message to infer a substantial risk of harm existed.[6]

The Court, therefore, grants Defendants' motion on grounds that Westmoreland did not suffer a constitutional violation and, therefore, Tyree is entitled to qualified immunity.

### 2. Monell *Liability*

Westmoreland asserts that BCJ is liable for Tyree's actions as a "final decision-maker". (Pl.'s Resp. Defs.' Mot. Summ. J. 14). When analyzing a plaintiff's Section 1983 claim against a municipality the court must determine: "(1) that a constitutional violation occurred; and (2) that

---

[6] Cases where officials were deliberately indifferent to a substantial risk of harm to a snitch shed further light on the deficiency of Westmoreland's evidence. *See Odom v. McKenzie*, No. 12-CV-79-HRW, 2012 WL 6214367, at *3 (E.D. Ky. Dec. 13, 2012) ("Odom alleges that prior to being attacked on November 20, 2011, he gave written notice to both Shawn Mckensie and Carla Sparks that Officer Holbrook had told other inmates that he was a 'rat' and had caused their cells to be searched; that other inmates had threatened to physically harm him because of Holbrook's statements to them, and that Mckensie and Sparks ignored Odom's claims and forced him to take his recreation time with the inmates who had allegedly threatened to harm him."); *Bales v. Turner*, No. 3:15CV1677, 2016 WL 1241947, at *2 (N.D. Ohio Mar. 29, 2016) ("Bales has satisfied these standards by alleging he told several members of the prison staff other inmates had threatened him for being a snitch, and by alleging the staff responded by taking no action, thus leaving Bales to fend for himself.").

11

the County 'is responsible for that violation.'" *Graham v. ex rel. Est. of Graham v. Cty. of Washtenaw*, 358 F.3d 377, 382 (6th Cir. 2004) (citing *Doe v. Claiborne Cty.*, 103 F.3d 495, 505-06 (6th Cir. 1996)). A municipality cannot be liable under *Monell* absent an underlying constitutional violation." *Martin v. Maurer*, 581 F. App'x 509, 512 (6th Cir. 2014) (citing *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014)). Accordingly, as Westmoreland did not suffer a constitutional violation, the Court grants Defendants' motion as to the *Monell* claim as well.

B. **State Law Claims**

Westmoreland contends that Tyree was negligent in failing to protect him and that BCJ failed to pay his medical bills in violation of KRS 441.045(3).[7] (Pl.'s Resp. Defs.' Mot. Summ. J.

---

[7] Westmoreland states his delayed treatment is "something for which the County Defendants can also be held responsible under Westmoreland's state law negligence claims, as well as his federal claims under 42 U.S.C. § 1983 pursuant to the Sixth Circuit's decision in *Blackmore v. Kalamazoo*." In *Blackmore v. Kalamazoo County*, 390 F.3d 890 (6th Cir. 2004), the Sixth Circuit addressed a failure-to-provide-medical-treatment claim. *Id.* at 896. Presumedly, Westmoreland is relying on the facts of his state law claims. Defendants did not reply to this allegation directly, but regardless, the Court grants summary judgment on the claim. After the attack, Tyree drove Westmoreland to the hospital on Tuesday June 5, and Westmoreland was later discharged. (Westmoreland Dep. 81:1-82:6). The hospital discharge record stated "f/u oral surgeon, Wed, call for appointment." (Defs.' Mot. Summ. J. Ex. 5, DN 26-7). Westmoreland claims Sublett set up an appointment for him on June 6. (Westmoreland Dep. 84:15-17). After being discharged, Tyree called the Commonwealth Attorney to inform him of Westmoreland's need for additional treatment. (Tyree Dep. 23:9-24:5). Ultimately, Westmoreland was released by a judge on June 7. (Tyree Dep. 23:9-24:5; Westmoreland Dep. 87:21-24). Two weeks later, he underwent surgery and still suffers pain from the attack and alleged delay in medical treatment. (Westmoreland Dep. 111:1-25). Westmoreland argues his discharge showed his jaw needed prompt attention by Wednesday June 6, at a minimum, and that BCJ failed to process his release in time for him to keep his appointment. (Pl.'s Resp. Mot. Summ. J. 17). Westmoreland does not dispute, however, that the decision to release him was left entirely to a judge and that Tyree followed BCJ policy by contacting the Commonwealth Attorney. Accordingly, without addressing Westmoreland's contentions that Defendants intentionally violated Kentucky statutory law, none of Westmoreland's evidence here shows how Tyree unconstitutionally delayed his treatment. *Farmer*, 511 U.S. at 844 ("prison officials . . . may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.").

12

51-18). The Court has discretion whether to entertain pendent jurisdiction over state claims filed in connection with and arising out of the same facts as Section 1983 actions. *Kitchen v. Chippewa Valley Schs.*, 825 F.2d 1004 (6th Cir.1987). As Westmoreland has no federal cause of action, this Court will exercise its discretion to dismiss his pendent state law claims. *See also Bowles v. Advanced Corr. Healthcare, Inc.*, No. 5:17-434-KKC, 2020 WL 7048274, at *10 (E.D. Ky. Nov. 30, 2020) (declining pendent jurisdiction on a motion for summary regarding the same claims here). Westmoreland may pursue the remaining claims in state court.

## V. CONCLUSION

For the reasons discussed above, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (DN 26) is **GRANTED**. Plaintiff's federal claims are **DISMISSED WITH PREJUDICE**. Because the remaining claims involve questions of state law, the Court declines to exercise its supplemental jurisdiction over those claims, which are **DISMISSED WITHOUT PREJUDICE**. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966); *Rouster v. Cty. of Saginaw*, 749 F.3d 437, 454 (6th Cir. 2014). The Clerk shall strike this matter from the active docket.

Greg N. Stivers, Chief Judge
United States District Court

February 23, 2021

cc: counsel of record